May it please the Court, Mark Whitburn for Plaintiff Appellant. Plaintiff Appellant was a doctoral student in the chemical engineering department at Texas Tech University. He is Hispanic. Most of his peers in the program were Asians. This is a case about his claims of discrimination on the basis of race and national origin. Plaintiff alleges many such examples. They include, and these are only examples, the provision of a timely qualifying exam in the spring of 2021. Plaintiff was not provided it. His Asian peers in the department were. Funding elimination in the spring of 2021. Plaintiff's funding was eliminated. His Asian peers in the department continued to receive their funding. The refusal of final approval of his dissertation after having received formal approval of his oral dissertation defense and his written dissertation. Plaintiff was denied final approval under these circumstances a mere two weeks prior to his commencement. His Asian peers were never denied final approval after having received formal approval of oral dissertation defense and written dissertation. Plaintiff's complaint is replete with allegations that his dissertation was thereafter continuously delayed by many unnecessary, vaunted corrections. There was a policy at Texas Tech University that when a dissertation advisor leaves the university, that the university is supposed to appoint a new dissertation advisor. Well, that happened for all of the Asian peers in those circumstances, but not for plaintiff. Plaintiff in those circumstances was forced to use the same dissertation advisor even though she was long gone and even though she continued to delay his dissertation. Enforcement of the two publications requirement. There was an asserted requirement that appeared after plaintiff came to the university requiring the publication, the actual publication of two publications before a dissertation defense. This was never enforced against the plaintiff's Asian peers. In fact, it wasn't enforced before it was enforced against him. It wasn't enforced during the time it was enforced against him, and it wasn't enforced after it was enforced against him. So throughout this entire period, the only individual against whom the two publications requirement was enforced was plaintiff. Was it ultimately enforced against him or was it later? It was ultimately enforced, Your Honor, and not in the precise form which appears on the website. So the form in which it appears on the website is that the two publications are supposed to be actually accepted before the dissertation defense. That wasn't enforced against the Asian peers. That wasn't enforced against my client either. But what was enforced against my client is the actual presentation of two publications. So there's a, and this is one thing that I think the district court misunderstood in terms of the allegations, and that is that the district court believed that because there was ultimately a waiver in, at the end of the day in December of 2021, that therefore there was no harm, no foul, that, that the, but you disagree with that. Well, the allegations, the allegations make clear that the waiver only extended to the actual acceptance of a publication by a journal. It didn't waive the requirement that there was a second publication. He still had to do it. And in fact, it wasn't just him. He had to still get the approval of Dr. Simon. She was involved in the, in that second publication as well. So the very person that was delaying the dissertation for the most part was also the person that was in charge and control of whether that publication got, got out. He still had to get the publication out. It's just that once she approved it, and once she turned it over to go out, then there was a waiver of whether some journal out there actually had to accept it. But none of these Asian peers actually had to do a second publication at all. In fact, some of them even to this day, at least since the time of the filing of the complaint, still didn't have a second publication out, and this was a year since. And lastly, the notice and opportunity to obtain a master's degree. The plaintiff's Asian peers were given the opportunity during the pendency of their program while they were in the course of obtaining their PhD, they were given the notice and opportunity of, to get a master's degree at the same time. Plaintiff was never given that. Now here's another instance where I think that the district court misconstrued the allegations. The district court found plaintiff's pleadings lacking because plaintiff did not point to a comparator of an Asian peer that did not get a master's degree after having graduated. But this is the point of the allegations. None of the Asian peers got a master's degree after they graduated because they were all given notice and opportunity during the course of their program. They never had to ask for a master's degree after they graduated. It was only plaintiff, the Hispanic, that wasn't given that notice and opportunity. He didn't learn of that until after he graduated, and so the remedy for him could only be, well, give it to me now. I did the same thing. There weren't extra requirements that were involved in obtaining this master's degree. I only would have had to do the same thing like my Asian peers did. You didn't give me the notice and opportunity then, so give me the opportunity to get it now. I guess my memory is Judge Hendricks sort of broadly faulted you for not giving the particulars as to each of these alleged disparate treatment moments as to the Asian peers being similarly situated. So the complaint did say that the Asian peers were relieved of the second publication requirement? Yes, absolutely, Your Honor. Okay, and he was also ultimately relieved of it, yes or no? He was not relieved of it. He had to do both, and they were relieved of it? Correct, yes, Your Honor. Okay, and just quickly, just so you recall where that is, you don't have to quote it to me. Do you have the paragraph? Sure, the enforcement of the two publications requirement is largely at ROA 177 to 8. When you say enforcement, it was not enforced as to Asians, and it was enforced as to him. That's the allegation. Yes, correct, Your Honor, and so I would direct the court to 177. Yeah, you just said that, okay. And then likewise, your allegation, the complaint states that the Asian peers didn't need corrections to their dissertations? No, they did need the corrections, but they weren't given them, whereas the plaintiff here, your claim is he didn't need the corrections? In other words, every Ph.D. dissertation is going to get edited and get corrections. To say that he was treated differently, the allegation has to be what? That they needed them, but they didn't get them? No, Your Honor, and allow me to explain, but let me finish my first answer because I didn't give all the records. No, you said 177 to 178. I did, but there are other sites as well. It's 191 to 192, and 201 to 203 are also relevant record sites for the two publications requirement and its enforcement. With respect to the corrections, he was asked to do a lot of corrections, which almost any Ph.D. candidate will be. You're saying the Asians were relieved of that? No, Your Honor. It's a timing issue, and so the timing was such that each student has an oral dissertation defense. They've got a qualifying exam. They've got an oral dissertation defense. By the time that there is an oral dissertation defense, the dissertation is supposed to be approved. Well, it's only going to get approved if it's accurate, and that presumes that the advisor isn't still proposing changes. That's correct, Your Honor, except that she did approve it, and so did everybody else on the committee. Oh, yeah. Because that representation of approval is supposed to be a representation that the dissertation is adequate, that the dissertation passes muster. So the allegation is not that the Asian peers never had dissertation corrections on their dissertation. Surely one would never allege that because that would be absurd, but the allegation is that— After approval, he was told to do more. Correct. So the first problem with timing is that all of his Asian peers, and I didn't even mention this part right now, Your Honor, but all of his Asian peers were permitted—see, everybody was told, you've got to get these things completed because I'm leaving. This is Dr. Simon speaking. And because April 5th, 2021 was the deadline that they had to get these things done, everybody else, all the Asian peers were given a dissertation defense before April 5th, 2021, so that they could go ahead and graduate. Not my client, not plaintiff. He was given an oral dissertation defense on May 13th, 2021, and then when he got there, he was told, okay, yes, we approve your dissertation, but then all of a sudden he was told, oh, wait, no, we're not going to approve that after all, we being Dr. Simon, and everybody else went along. And then between May 13th, 2021 and the new proposed graduation date of August 2021, then there's all these further dissertation edits. So the allegation is not, Your Honor, that none of these Asian peers were ever required to edit their dissertation. Surely they were. But the allegation is once they got to the oral dissertation defense, they were uniformly told that that was it. Their dissertations were approved. In fact, plaintiff was told the same thing. You're approved. Oral dissertation approved. But then there were these continuous delays. And then once the delays kept going, all of a sudden — You call them delays, but it's back and forth. Editing from Advisor, I guess I'm a little confused. Where's the disparate treatment if he's fortunate enough to have continuity with his thesis mentor? In other words, that would seem to me to be an advantage. Sure, faculty members leave, but lo and behold, your client is given continuity with the mentor. I think, Your Honor, that that would be a reasonable response to this allegation if it were in a vacuum, if this were the one individual instance. So we wouldn't be here today, for example, if all of this was continuous dissertation edits. But you have to look at it in the whole gamut of allegations. So this is the same person that forced only him to speak English. All the Asian peers were not — Just because of timing, since you did list a lot, could you just narrow it down to the single most obvious fact dispute as to disparate treatment, where they were accurate comparators? Where was the district court most wrong? I think the district court was most wrong with respect to the two publications requirement. I think that that is the most glaring example of disparate treatment. When you have the Asian peers that are repeatedly being allowed to graduate with one publication or no publications, then you have all of a sudden — and they're never checked on this. They're never checked. Then all of a sudden, after the sort of timing issues that we discussed, all of a sudden, only plaintiff is checked, and during the same time period. So this is just some sort of — Who would be the — this is Dr. Sacco? This is Dr. — The allegation is he knew that Asians had not completed the requirement, but he still approved them to graduate. Dr. Sacco did. That's the allegation in the complaint. Where would I find that? So the Dr. Sacco allegation is 196 to 7, Your Honor, and Dr. Sacco was the dean of the College of Engineering. But it's not only Dr. Sacco. Dr. Weeks, the dean of research and graduate programs, he checked and enforced the requirement against Zapata, but not against the Asian peers. That's in 177 to 8. Dr. Weeks knew by July 22nd of 2021 that at least six of Dr. Simon's Asian students were allowed to graduate without satisfying the requirement. Allowed to graduate. Okay. But isn't Sacco the one who would actually approve the graduation? All of these individuals were part of the process of — But Sacco's the dean, correct? Sacco is the dean of the College of Engineering. It seems to me when I look at 196 to 197, the complaint is going to allege that he knew Asians were being allowed to graduate without the two publications, but your client wasn't. That's what I'm going to find when I look at 196, 197? Yes, Your Honor. But Dr. Weeks is — More specifically, I'm reading from your opening brief. You say plaintiff was required to comply with the two-publication requirement. But then you add, in the end, university administrators simply waived the requirement that he wait for the acceptance of the second publication by a scientific journal. That's correct. So in some way it was imposed, but in another way it was excused, is what I'm reading from your brief. When I say in the briefing they simply, I mean they merely, they merely excused one part of the requirement. When I say they simply excused it, I don't mean, okay, we're just not going to do this requirement after all. Remember, Your Honor, that this happened, this waiver happened on December 3rd, right? Right after Dr. Simon had finally submitted the publication in question. So they waited until after that second publication was done before they waived the requirement that it be accepted by a journal. The only thing that was waived, Your Honor, was the acceptance by a journal part. All of these other Asian peers didn't have to comply with this requirement at all. They were never even checked to see if their requirement, if they were, had to comply with it. And the reason that I mentioned Dr. Weeks, Your Honor, is because he did have an important role, and if the Court can look at 177 to 178 with respect to Dr. Weeks. Dr. Weeks is a somewhat strange quantity in all of this because he ultimately was appointed a dissertation approver for plaintiff, but it didn't stop the role of Dr. Simon. And so there was some thought, and we're not exactly sure what happened here, but certainly plaintiff had been complaining that, I'm sure I'm not already out of time. Yeah, you are. Oh. That's fine. Okay. You can finish. It's up to him. Doctor, plaintiff had been complaining that Dr. Simon shouldn't be his dissertation advisor anymore. The university appointed a dissertation approver who would then have had the opportunity to weigh in on these things, and yet it didn't stop the role of Dr. Simon. She kept delaying and delaying and delaying. She kept playing her role of dissertation advisor, and nobody stepped in to prevent that. Thank you. All right, Mr. Whitburn, you've saved time for a vote. Thank you. Yes, thank you. Mr. Contreras? May it please the Court, my name is Jason Contreras, and I represent Texas Tech University and all of the individual appellees. This Court should affirm the trial court's dismissal of Zapata's claims for two reasons. Number one, he has failed to plausibly state a claim for relief, and number two, because the individual defendants are, in fact, entitled to qualified immunity. And just from the very get-go, I think the analysis should begin with putting the case into the proper context here of while Zapata was a Ph.D. student at the university, he was never expelled, he was never suspended, and he was never ever any other type of material adverse action was ever imposed upon him. To the contrary, in December 2021, despite all the alleged delays that Mr. Zapata claims were imposed upon him based on his race and national origin, he proceeded to graduate with a near-perfect GPA of 3.92, and he went on to promptly obtain employment. And I think those undisputed facts alone clearly weigh in favor of Zapata being unable to show that what he alleges are simply nothing more than a sheer possibility of unlawful conduct. But are you saying that if he had any delay, that that could not equate to an adverse action? No, because the delay, and I was going to get to that, Your Honor, I'm glad you asked me that. The delay that he is essentially arguing were these corrections to his dissertation, repeated corrections, which I guess he felt his work was just beyond question. But he's essentially trying to ask the court to second-guess the professional academic judgment of his dissertation advisor and other university officials, which clearly the law of the land under the U.S. Supreme Court case in Horowitz is that courts afford great deference to universities, higher institutions. I've heard his arguments a little more refined. It's every other Asian peer, when they got to their oral defense, the dissertation was done. No more edits afterwards. Uniquely him, oral defense, but now much more corrections, corrections from someone no longer even at Texas Tech. Zapata is mischaracterizing the process because there's two components to the dissertation. There's the oral defense, and then there's the final written dissertation portion of it. He's not alleging anything about the oral defense. He passes oral defense. That was no question, I believe, early in the spring of 2021. His complaint, the crux of his complaint, was that he had to make repeated corrections to his final written dissertation. And clearly, as opposing counsel just acknowledged, there's no such thing as a perfect dissertation that's submitted, especially, obviously, I think the court can take judicial notice that, obviously, a PhD is a very rigorous academic process subject to much, much higher scrutiny than you would even with a thesis-level master's degree. But the bottom line is that's essentially what plaintiff's complaint is about having to make numerous corrections, is essentially asking this court to pull out a chapter of his dissertation and look at complex engineering formulas and mathematical formulas and try and figure out. No, you know what his claim is, and Judge Higginson expressed it correctly. His claim is that he was, in that regard, he was treated differently from his peers who were Asian. Speak to that. Yes, Your Honor. And that allegation, I think, is not pled properly by the plaintiff, Mr. Zapata, because under Fifth Circuit law, Richardson v. Axiom, only well-pleaded, it's not just all facts must be accepted by the plaintiff. The standard is, quote, unquote, well-pleaded facts. And our position in this case is that he didn't allege in his live pleading that Asians, that Dr. Simon, who had Asian PhD dissertation students, PhD students, that they were never asked to make corrections, that they were never asked to make corrections. They were not made to make more corrections after the oral presentation. That usually by the time of the oral presentation or the defense, that all of the written changes are usually completed by that time. Well, that's incorrect with respect to the actual final written dissertation work product, which is only one of the components to the dissertation process. The oral defense is its own, you know, I guess, inquiry in and of itself. But then you have the written dissertation portion, which must be, which is subject to the final approval of Dr. Simon, his dissertation advisor. And her corrections are clearly or essentially what Zapata's claiming were not necessary, that she somehow asked him as a PhD student to make corrections to a much more degree, a greater degree than the Asian students. But the bottom line is he's ultimately asking courts to second guess the professional academic judgment, her professional academic judgment as to, you know, getting the written dissertation into the appropriate final form that meets the rigorous academic standards at the PhD level. And I think that that's essentially the flaw in Zapata's case. Oh, there's also a fifth source. He listed a lot, but I did ask him to specify the most direct. Is it not correct that he sufficiently pled that Dr. Simon insisted that he speak in English but not the Asians? One, you can just write these down. And number two, did Texas Tech give the master's to Asian peers but not to him? That's the second one. And then the last one is did Texas Tech waive for the Asians the two-publication rule, but as to him, he had to write it and complete it even if he didn't have to actually get it published. So what's your answer to those three alleged disparate treatments? First of all, on the English-only rule, Judge, there's at least one Fifth Circuit case that we cited to, Garcia v. Gloor, Fifth Circuit, 1980, that at least within the employment context, forbidding a bilingual person from speaking anything but English while on the job is not discrimination based upon national origin as applied to a person who is fully capable of speaking English. This isn't what Judge Hendricks ruled, though. No, but it is persuasive legal authority. Why don't you start by defending, if you want to, Judge Hendricks' ruling, that somehow it wasn't sufficiently plausibly alleged that she treated the Asian peers differently than he did as to native tongue? Yes, because within the education context, well, I don't believe the plaintiff pled that the English-only rule wasn't enforced against the Asian students, and even if he did, and even if she did, the Garcia v. Gloor case should apply as well in the education context for the reason that if they're in a group— I'm guessing. I don't remember that case being used in the brief or cited by Hendricks, so I'll look at it. But I assume, yes, it's fine to require people to speak in English, but it's not fine to say you have to speak in English, but you can't. Correct, and the allegation that Zapata conveniently omits from his pleading is the fact that the English-only speaking rule was applied across the board, not only to Zapata, but also to the Asian students. For the obviously reasonable rationale is that you're in an academic setting, and you have people from different countries, and some of them will speak in their native tongue. In a group setting, the reasonable solution to that is in a group setting, everybody speak a common language so they can understand each other. And then the two others I wanted to know about, yes or no, he pled that masters were given to Asians but not to him. Yes, in his brief on appeal, he conveniently omitted when he came to the university and asked for a master's degree in the first place. This was in August, I believe, of 2022, so he had already graduated. It had been at least eight or nine months since he graduated when he contacted, apparently in the interim between his graduation to the point that he finally contacted Texas Tech, that, oh, you should also give me this non-thesis master's degree. So first of all, on that point, he had already graduated, he had already matriculated, and he made no allegations, and he certainly fails to plead or identify any similar-situated comparator, i.e., an Asian student who was in that exact same situation as him that had already graduated but that was given. Dr. Simon told the Asians you need to ask for it, but she explicitly excluded him. That would have to have been alleged. That's not alleged. What Zapata is essentially saying is that during that five or six years he was at Texas Tech, the university never gave him notice to say, hey, there's this master's degree that you can also get. That's his allegation, but which I think is – and essentially what he's suggesting is that the university was only disclosing the availability of this non-thesis master's degree to one group of protected persons and completely keeping it a secret to the rest of the public, which is such an utterly ridiculous allegation to suggest because that would not only be illegal on so many levels, but how would that even happen at a state university level? And presumably when he began his Ph.D. studies at Texas Tech, I believe every student is provided with a catalog that informs them of what degrees are available, and certainly he was on the Ph.D. program, but that was information that was readily available to him as a student at Texas Tech for years, so I don't think that meets the plausibility standard for him to even suggest. And the one he said was the most glaring was that Texas Tech waived the two-publication rule as to the Asian peers, but he was required to do it all the way up to publication. And that is flatly incorrect, and he's speaking out of – I think he's speaking out of both sides of his mouth on that because, first of all, he said that the Asian students didn't have to comply with it at all, okay, in one hand, and then in another part of his own live pleading is that, oh, well, there were some Asian students that were able to graduate with only one publication. So which is it here? Were they not required to comply with the two-publication requirement in any form or fashion, or did some Asian students in fact comply at least to a certain degree with the two-publication requirement by at least doing one publication, being permitted to graduate without having to do the second one? So he's kind of flip-flopping on which is it here. Last clarification, was it waived as to him, or was it not waived? It was waived because the rule, as stated by Zapata in his own pleading, is that the two-publication rule requires that it be fulfilled by a publication written with a dissertation advisor, with the student as the first author. And he doesn't say anything about his first publication with compliance with this rule. He speaks of his second publication, and in December it was finally given. He was given the special disposition, and he was permitted to graduate. So I think that's pretty clear. But the other important part on his second publication is in his own pleading, he was not the first author. He was the third author. And I'm trying to find that site for you here. But his own pleading effectively admits that he didn't comply with the two-publication requirement either. And just like the Asian students who did not comply with the second publication requirement, bottom line, he was allowed to graduate in December. And, oh, it's Record on Appeal, page 199, is where he admits that on the second publication that he was the third author. So his own second publication that he's claiming this imposition of the rule that was applied against him, you know, desperately as compared to the Asian students, he didn't have to comply with either. And I think part of the other thing that must be mentioned is that – Is it true that there were some Asian students where both publications were waived? I don't – I'm sorry? Is it true that there were some Asian students where both publications, not one publication, but both publications were waived? Zapata seems to allege that there were two groups of Asians. There was one group in which they never had to comply with any – never even did one publication. So on that allegation, since we're at, I believe, the motion to dismiss stage, what else would he have had to allege in that regard to survive the motion to dismiss? Well, I think what he would have to allege instead of, you know, these deficient, not very well-planned allegations in speaking in extremely general terms was that the Asian students – so there were two, once again, but I think on that part, the first of it is that he acknowledges that at least some Asian students had done – had at least written one publication. My question was with regard to those where both publications were waived specifically. Okay. Well, I think on that point, Zapata doesn't really plead sufficiently to explain that scenario. He doesn't – he certainly doesn't identify by name any students. I think he doesn't – Would have been required to name the comparatives in the complaint. At least to be able to meet the similarly situated standard, which he hasn't done, and I think that was something very important that the district court pointed out, is that his allegations are not very well-plaid because they're so broad and general. He can't just say, well, there was me. I'm from Colombia. I'm from a different country. This was racism against women of national origin. Then there were this other group of Asian students without really giving any kind of sufficient detail, anything more than just saying there were these Asian students and they were also under Dr. Simon. And one other important point on that is, well, are these other Asian students in a thesis master's degree? Was she over them and they were master's degree students having to write a thesis? Or were they Ph.D. students as well? He really doesn't specify it. And so I think that harkens back to the standard here, which I don't think is in dispute, is the plausibility standard. Zapata must – the plausibility standard asks for more than a sheer possibility of unlawful conduct. And I think the bottom line here is that he should not be – he failed in that regard because the facts he pleads stop short of the line between sheer possibility and plausibility to entitle him to any relief. And I believe, Your Honor, was there the third point? Was his dissertation approved and yet then he still was told to do more corrections? Or am I wrong about that? The oral dissertation defense, yes. The written dissertation, did she continue to require corrections after it had been approved? Or was it never approved and she kept, out of the generosity of her heart from someplace other than Texas Tech, kept saying, hey, I've got something that helps this more, this more, this more? Well, I think one thing that caused a little bit of disruption there was the fact that she was leaving to go to work for a different university and she was effectively not there at that time. She was moving to North Carolina State University as a professor there. And, you know, this goes to the deliberate indifference standard. When all that was going on, university officials, they met with Zapata. They had meetings. They addressed his concerns about the corrections. They addressed his concerns about the two-publication requirement. So I don't think that meets the deliberate indifference standard. But do you have an answer to my question? In other words, did she keep sending corrections from North Carolina State to him even after, in any way, his dissertation had been approved? She did have corrections to his final written work product dissertation, which is common in academia. Final as in already approved or still about to be submitted? Final in final form approved by his dissertation advisor. And so what Zapata, I think, is being misleading about is his argument that his dissertation was finally approved in the spring and that he didn't have to make any more edits to it. It was done. He should have graduated in the spring. That's not consistent with academia. And bottom line is his dissertation was not in final form and could not be subject to, and it's final approval, not just approval, it's final approval by his dissertation advisor. And once again, the corrections were simply through this lawsuit attempting to second-guess her professional academic judgment. And I have the other case on that Fifth Circuit case, but it is cited in our brief. It's Bissong. And then also just one other important case that Mr. Zapata does mention in his brief, and he seems to advance this Cruz v. Payne case as somehow supporting his claim of deliberate indifference. And that Cruz v. Payne case was cited on page four of his reply, but that was an employment termination case. And that case was addressed on the summary judgment standard. This case is not a discipline case. Once again, he was never expelled. He was never suspended. The two-publication requirement was an academic requirement. It's totally apples and oranges compared to expulsion or suspension case. And I think the bottom line is when you do the final analysis here, Zapata has failed to meet the requisite standard of alleging well-pled facts that get his case across the line from sheer possibility to plausibility. And that's essentially, you know, I don't think it's necessary to go over that well-established standard here of 12B6. But the one last point I wanted to mention is his point of error, which I don't think he properly preserved with the trial court because he never addressed it at the trial court level. But I'll be as brief as possible. But he's, you know, complaining that the trial court dismissed his claims with prejudice without leave to amend. He's saying this repeatedly here. But he did amend his complaint as a matter of course once when at the trial court level, Texas Tech, we filed a motion to dismiss. He reviewed our motion to dismiss. It addressed each and every point under the exact same 12B6 standard. Your time has expired now. Thank you. Yes, thank you. But the bottom line on that is that. Your time has expired.  Thank you for your time. Mr. Woodburn for Rabeau. Thank you. I'd like to respond first to some of the general tenor of the discussion that my colleague had with the court just now. For example, with respect to the issue of the two publications rule, my colleague said, well, that's plaintiff's allegations are just wildly incorrect. With respect to the issue of the oral dissertation defense relative to comments and corrections that occur after the oral dissertation defense, my colleague said, well, that's just incorrect. With respect to the master's degree issue, plaintiff's allegations are simply incorrect. Of course, those kinds of comments are not appropriate for the discussion with the court today because the question is not, are plaintiff's allegations factually correct? The question is, did he allege them? Did he plausibly allege them?  I mean, of course. What would happen if we were to agree with you? I'm not suggesting we will or we won't, but if we happen to agree with you that the allegations were sufficient to get you past the 12B stage, what then would happen in the district court? In the district court, the parties would have the opportunity to engage in discovery and then defendant would have the opportunity to show plaintiff how wildly incorrect he is. But there has been no opportunity for discovery. This was decided on the plaintiff's. And what's the ultimate relief that you're seeking now that your client has graduated and apparently is successful? The ultimate relief that my client is seeking is damages and some injunctive relief in terms of the award of the master's degree, which is significant to him because for the master's degree, to have that is no just sort of minor reward. There's a reason why the Asian peers were given notice of this and why plaintiff has been damaged by not being given notice of this because it matters. Having these degrees matters. He requested it after graduation. He requested it after graduation because he wasn't aware until after graduation that these things had occurred. And one thing to keep in mind, although this isn't – it may be a reasonable inference from the record for the plaintiff the way it's plotted, but plaintiff's difficulty is not with the Asian peers. The Asian peers have often expressed to him that they have no idea why this happened either. He doesn't have any difficulty with these Asian peers. Some of the Asian peers are the ones who explained to him that they didn't have these publications out there. You're jumping around. So when you say the Asian peers were given notice in the complaint by whom and when? There's not a by whom and when. That would be difficult for a plaintiff to know that. I thought you said he talked to them. That would be more of a 9B kind of plea. Really? His argument is everybody was told that they need to request for a master's, but he was excluded. But yet it was just this subset of Asians, so presumably it was Dr. Simon? Does the complaint get into any of this as terms of being plausible? The complaint does not get into who told whom when because a lot of this is coming from the Asian peers. Oh, I knew this, right? Well, they could have said Dr. Simon told us we need to ask for this. These individuals have a variety of different dissertation committee members, and so it wouldn't have only been Dr. Simon that they were interacting with. Would it have to be? I mean, for there to be some disparate treatment between different students, would it have to be the same professor or advisor or approver? I don't think so, Your Honor. So you can have different advisors giving different advice or maybe being a better advisor to their students than others, and that would be disparate treatment? I think in this particular instance. So certainly in the early going, the disparate treatment was predominantly from Dr. Simon when we talk about the English-only allegations, the yelling at a plaintiff. It sounds like now you're saying Dr. Simon was not necessarily the advisor for your comparators. I beg your pardon? It sounds like you are now saying that Dr. Simon may have not been the advisor for your comparators. So there were five comparators in plaintiff's group, and so those five were comparators with respect to a lot of the allegations in the complaint. But, for example, for the two publications requirement, not only were those five Asian comparators excluded from the two publications requirement, but it went broader than that. There were other Asians in the department that did not have to meet that as well. So it's not just a single group of comparators for purposes of every allegation, but certainly for purposes of Dr. Simon's group, there were five Asians and then there was plaintiff, the Hispanic. And, by the way, speaking of the Asian peers, it's incorrect to say that there were sort of two groups of Asians, some of which were required to comply with some part of the two publications requirement and some which were not, as my colleague would have it. Rather, it's simply that none of them were required to comply with this requirement. It was never checked. But some of them happened to have one publication. Certainly as a dissertation student, as a doctoral student, one might be expected to come up with a publication that enhances one's career, or it can. Some of them had one. Some of them had none. None of them were expected to comply with it. Only plaintiff, the Hispanic student, was. Thank you, Your Honor. Thank you, Mr. Whitburn. Your case is under submission.